1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    HOWARD WASHINGTON,                    No.  2:22-CV-2272-DC-DMC-P

12              Plaintiff,

13         v.                               <u>FINDINGS AND RECOMMENDATIONS</u>

14    M. UDDIN, M.D.,

15              Defendant.

16

17          Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18    42 U.S.C. § 1983.  Pending before the Court is Defendant's motion for summary judgment.  <u>See</u>

19    ECF No. 33.  Plaintiff has not filed an opposition.

20          The Federal Rules of Civil Procedure provide for summary judgment or summary

21    adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file,

22    together with affidavits, if any, show that there is no genuine issue as to any material fact and that

23    the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

24    standard for summary judgment and summary adjudication is the same.  <u>See</u> Fed. R. Civ. P.

25    56(a), 56(c); <u>see also</u> <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

26    the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  <u>See</u>

27    / / /

28    / / /

                                              1

1   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the

2   moving party

> . . . always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any," which it believes demonstrate the absence of a
> genuine issue of material fact.
>
> Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P.
> 56(c)(1).

8           If the moving party meets its initial responsibility, the burden then shifts to the

9   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

10  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

11  establish the existence of this factual dispute, the opposing party may not rely upon the

12  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

13  form of affidavits, and/or admissible discovery material, in support of its contention that the

14  dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

15  opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

16  affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

17  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

18  Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

19  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

20  (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

21  simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

22  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

23  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

24  claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

25  of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

26  / / /

27  / / /

28  / / /

2

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

## I. BACKGROUND

### A.    Procedural History

On January 25, 2023, the Court issued a screening order finding Plaintiff had stated cognizable claims against Defendant Uddin and providing Plaintiff an opportunity to file an amended complaint to cure the deficiencies identified by the Court with respect to claims against Defendant Lynch. See ECF No. 11. On April 5, 2023, after Plaintiff failed to file an amended complaint, the Court issued findings and recommendations that the action proceed on the original complaint as to Plaintiff's Eight Amendment medical care claim against Defendant Uddin only, and that Defendant Lynch be dismissed. See ECF No. 13. On July 25, 2023, the Court's findings and recommendations were adopted in full by the District Judge. See ECF No. 22.

On July 17, 2023, Defendant Uddin filed an answer. See ECF No. 20. On August 21, 2023, the Court issued a discovery and scheduling order with the deadline for completion of discovery set for April 22, 2024, and with a deadline for filing of dipositive motions set for 120 days after the discovery cut-off date. See ECF No. 26.  After the close of discovery and after

1  being granted additional time to file dispositive motions, Defendant Uddin filed the pending

2  motion for summary judgment on October 18, 2024. See ECF No. 33. To date, Plaintiff has not

3  responded to Defendant's motion.

4          **B.**     **Plaintiff's Allegations**[1]

5          Plaintiff Howard Washington names as Defendant M. Uddin, M.D., a physician

6  employed with California Correctional Health Care Services (CCHCS) at California State Prison,

7  Sacramento (CSP-SAC). See ECF No. 1, pgs. 1, 7. Plaintiff claims deliberate indifference to a

8  serious medical need under the Eighth Amendment and negligence under California state tort

9  law for Defendant's alleged failure to reasonably respond to Plaintiff's risk of losing his

10  eyesight. See id. at 3. Specifically, Plaintiff claims that after receiving cataract surgery for his

11  left eye on August 4, 2020, he was struck in his left eye by his cellmate on August 9, 2020. See

12  id. at 7-8. As a result, Plaintiff was hospitalized for eight days. See id. at 8. On August 17, 2020,

13  Plaintiff was discharged and prescribed several "medications [to] be given . . . at the Prison,"

14  including pain medication. See id. at 9. However, Plaintiff claims that, despite complaining about

15  "the pressure [going] up in Plaintiff's left eye [which] caused Plaintiff extreme pain and

16  discomfort" on August 18, 2020, Defendant Uddin "responded by cutting Plaintiff's medications

17  off and on which caused Plaintiff to suffer in between times." See id. Plaintiff further claims that

18  "Defendant [M.] Uddin, M.D., failed to follow the instructions and recommendations submitted

19  by Dr. Gregory C. Tesluk, and failed to keep Plaintiff's doctor's appointment within the (5) day

20  period." See id. at 10. Only "[a]fter (30 plus days) of agonizing pain," Plaintiff claims, was

21  "Plaintiff finally [able to get] the surgery that was required, but by then it was too late [as] his

22  vision was already los[t]." See id. at 11. In sum, Plaintiff claims that "Plaintiff was purposefully

23  treated poorly and unfairly by . . . Defendant, and his negligence, coupled with his action of

24  deliberate indifference, caused Plaintiff to go blind in his left eye." See id. at 10.

25  / / /

26  / / /

27  ────────────────────

28          [1]    The Court's summary is limited to Plaintiff's claims against the sole remaining
defendant.

1

## II. THE PARTIES' EVIDENCE

2          Defendant's motion is supported by a memorandum of points and authorities, see

3    ECF No. 33, and a separate statement of undisputed facts, see ECF No. 33-2. Defendant also

4    relies on: (1) the declaration of defense counsel Nicholas P. Banegas, Esq., and exhibits attached

5    thereto, see ECF No. 33-3; (2) the declaration of Defendant M. Uddin, M.D., see ECF No. 33-4;

6    and (3) the declaration of B. Feinberg, M.D., see ECF No. 33-5.

7          According to Defendant, the following relevant facts are undisputed:

8                         * * *

9          5-7.    On June 8, 2020, Plaintiff was seen by an outside eye
       specialist, Dr. Wong, who recommended Plaintiff be referred to an
10      ophthalmologist.  (Feinberg Decl. at ¶¶ 9-10).

11                        * * *

12         9.     On June 22, 2020, Dr. Uddin reviewed Dr. Wong's notes
       and submitted a request for Plaintiff to see an ophthalmologist; the request
13      was approved, and the visit was scheduled for July 27, 2020.  (Feinberg
       Decl., at ¶ 11; Uddin Decl. at ¶ 9).
14

15         10-11.  On July 13, 2020, Dr. Uddin was asked by prison officials
       if Plaintiff's referral could be postponed due to the risk associated with
16      COVID-19.  Dr. Uddin responded that, because of risk of loss of vision,
       the appointment was too important to be cancelled.  (Feinberg Decl. at ¶¶
       12-13; Uddin Decl. at ¶ 10).
17

18         12.    Plaintiff was examined by outside ophthalmologist Dr.
       Gregory Tesluk at the Modesto Eye Surgery facility on July 27, 2020.
19      (Feinberg Decl. at ¶ 14).

20         13-15.  On examination, Dr. Tesluk noted a cataract, a vitreous
       hemorrhage, and a detached retina in Plaintiff's left eye and recommended
21      multiple surgeries, with a cataract procedure to be done first on an urgent
       basis.  (Feinberg Decl. at ¶ 14; Uddin Decl. at ¶ 11).

22         16.    On July 28, 2020, Dr. Uddin reviewed Dr. Tesluk's
       recommendations and ordered that Plaintiff's cataract surgery be
23      scheduled for the first week of August 2020; the request was approved the
       same day.  (Feinberg Decl. at ¶ 15).
24

25         17.    On July 30, 2020, Dr. Uddin met with Plaintiff to review
       the treatment plan and make sure that Plaintiff's eyedrops had been
26      ordered.  (Feinberg Decl. at ¶ 16; Uddin Decl. at ¶ 12).

27         18.    Dr. Tesluk performed cataract surgery on Plaintiff's left
       eye on August 4, 2020.  (Feinberg Decl. at ¶ 17; Uddin Decl. at ¶ 13).

28    / / /

1              19.     In his notes, from August 4, 2020, Dr. Tesluk stated that
the procedure went well and recommended that Plaintiff return to see him
in 3 to 7 days to assess the best timing and planning of the vitrectomy
surgery. (Feinberg Decl. at ¶ 17).

20.     On August 6, 2020, Plaintiff saw Dr. Tesluk for follow-up
on his cataract surgery and for planning of the vitrectomy procedure. On
examination, Plaintiff's vision in his left eye was significantly reduced.
(Feinberg Decl. at ¶ 19; Uddin Decl. at ¶ 14).

21.     Dr. Tesluk recommended that [Plaintiff] undergo the
vitrectomy procedure to the left eye "in a few weeks when the eye has
healed a little better" and cautioned him to avoid exercise or any other
activity that could damage his surgically repaired eye. (Feinberg Decl. at ¶
19).

22-25.  Plaintiff was attacked by his cellmate on August 9, 2020,
and struck in his left eye with a fist or blunt object. Plaintiff complained of
increased pain his left eye and was taken to triage and treatment area
where he complained of a total loss of vision in his left eye.  (Pl's Depo. at
p. 62:20-25; 66:3-11; Feinberg Decl. at ¶ 21).

26.     The physician on duty was called and ordered that Plaintiff
be taken to the emergency department at UC Davis Medical Center.
(Feinberg Decl. at ¶ 21).

27.     Within hours [of the attack] Plaintiff was admitted to [UC
Davis Medical Center] UCD, where he remained for the next several days.
UCD ophthalmologists examined Plaintiff and immediately performed
emergency surgery on his damaged eye. . . . (Feinberg Decl. at ¶ 22. Uddin
Decl. at ¶ 16).

* * *

32.     On August 21, 2020, Plaintiff was seen at UC Davis
Medical Center for a follow-up examination with the ophthalmology
department which recommended a laser iridotomy procedure.  (Feinberg
Decl. at ¶ 27; Uddin Decl. at ¶ 21).

33.     The procedure was performed after informing Plaintiff of
the possible risks, including an increase of post-procedure intraocular
pressure, however, the procedure was not successful.  (Feinberg Decl. at ¶
27; Uddin Decl. at ¶ 19).

* * *

35.     Plaintiff was seen at UC Davis Medical Center on August
26, 2020, for a follow-up at which time it was noted that Plaintiff had
elevated intraocular pressure in his left eye following the failed procedure
on August 21, 2020.  (Feinberg Decl. at ¶ 28).

/ / /

/ / /

36.     At his deposition, Plaintiff states that, even if necessary, from August 6, 2020, forward he refused to allow his left eye to be pierced even though that would be required for a vitrectomy required to repair Plaintiff's left eye detached retina.  Feinberg Decl. at ¶ 28; pl's Depo. At pp. 77:22-78:9).

*  *  *

42.     Plaintiff returned from his August 26, 2020, appointment at UC Davis Medical Center without any discharge instructions or doctor's notes. The only document he brought with him from UCD was a handwritten prescription for Norco, which is Tylenol plus hydrocodone. (Feinberg Decl. at ¶ 28. Uddin Decl. at ¶ 21).

43.     Dr. Uddin was contacted regarding this nonformulary medication and changed it to the equivalent formulary medication of Tylenol with codeine also called Tylenol 3. [T]his is done for all the inmates because the prison does not have Norco. (Feinberg Decl. at ¶ 28. Uddin Decl. at ¶ 21).

44.     On August 31, 2020, [Plaintiff] was scheduled to see Dr. Uddin for follow-up from the UCD ophthalmology visits. However, because of COVID-19 precautions, this visit was replaced with a chart review by Dr. Uddin. (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 23).

45.     In his notes from August 31, 2020, Dr. Uddin documented that he "was waiting for records from UCD but have not received that yet in spite of multiple attempts. … I will wait for the UCD record and review it. If there is any new orders I will take care of that." (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 23).

46.     [After Plaintiff's August 26, 2020, follow-up appointment at UCD], Dr. Uddin continued the Tylenol with codeine for [Plaintiff]. (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 23).

47.     Emails from Dr. Uddin to his administrative staff confirm that he attempted multiple times to get Plaintiff's records from UC Davis Medical Center. (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 24).

48.     On September 9, 2020, Dr. Uddin finally received the notes from Plaintiff's August 26th visit from UC Davis Medical Center. (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 26).

49.     Upon immediate review Dr. Uddin noted that Plaintiff's treating physician at UC Davis Medical Center, Dr. Annie Baik, recommended that Plaintiff follow up with her in "2-3 weeks." [Exh B p. 90.) (Feinberg Decl. at ¶ 29; Exh. B at p. 90. Uddin Decl. at ¶ 25).

50.     That same day, Dr. Uddin submitted an urgent request for service for Plaintiff to be seen by ophthalmology. (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 26).

/ / /

/ / /

7

51.     Because Dr. Baik's Letter of Authorization with CDCR had expired, Dr. Uddin requested that Plaintiff be approved to see his other treating ophthalmologist, Dr. Tesluk. (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 26).

52.     Dr. Uddin submitted the request with the highest level of urgency and it was approved by the Chief Supervising Physician later that day. The earliest available appointment with Dr. Tesluk was for September 17, 2020. (Feinberg Decl. at ¶ 29. Uddin Decl. at ¶ 26.)

53.     On September 17, 2020, [Plaintiff] saw Dr. Tesluk for follow-up. Tesluk noted that while he had intended to perform a vitrectomy procedure after the cataract procedure he had performed, "prior to this surgery occurring, Mr. Washington was referred on a weekend to UC Davis because of a new injury whereupon the UC Davis Department of ophthalmology took over his care." (Feinberg Decl. at ¶ 30).

54.     At this time, Dr. Tesluk noted that Washington's vision in the left eye had further deteriorated to "no light perception … which indicates that only conservative palliative care is probably indicated at this point." (Feinberg Decl. at ¶ 30; Exh. B at pp. 103-104).

55.     Dr. Tesluk had determined that additional surgeries would be unlikely to return any visual acuity to Plaintiff's damaged eye and, therefore, the focus on Plaintiff's care should shift from restoring his vision to making him more comfortable. (Uddin Decl. at ¶ 28).

56.     At deposition, Plaintiff confirmed Tesluk's observation and admitted that by the time he saw Tesluk on September 17, 2020, he had already lost all vision in his left eye. (Pl's Depo. at pp. 99:11-21; 100:23-101:2).

* * *

59.     At deposition, Plaintiff clarified that naming Dr. Tesluk in Paragraph 30 of the Complaint was a mistake and that the allegation should read "failed to follow the instructions and recommendations submitted by Dr. Annie Baik…" (Pl's Depo. at pp. 113:23-114:9.)

* * *

63.     Plaintiff admits that he has sued Dr. Uddin simply because Dr. Uddin was his primary care doctor at the time he suffered the injuries alleged in his lawsuit.  (Pl's Depo. at p. 15:17-25).

64.     Plaintiff never spoke with Dr. Uddin about any changes to his pain medication and has no evidence that Dr. Uddin withheld pain medication from him. Plaintiff holds Dr. Uddin responsible only because Uddin was his general practitioner. (Pl's Depo. at p. 107:1-12).

65.     Plaintiff has no idea if anyone specifically changed or cancelled his pain medication prescription, just that sometimes "he would go to [his] regular nursing appointments and the medication wouldn't be there." (Pl's Depo. at p. 106:16-25).

66.     When his pain medication was not at the medical window, he would have the nurse send an email to Dr. Uddin telling him "to do [Plaintiff's] prescription again" and Plaintiff would usually receive the pain medication "the next day." (Pl's Depo. at p. 106:16-25).

67.     Plaintiff does not know if there was a medical reason for any change to his supplied pain medications. (Pl's Depo. at p. 107:13-16).

68.     Dr. Uddin ordered that Plaintiff be provided with Tylenol 3 from his return from UC Davis Medical Center on August 26th until September 23, 2020, when he started tapering Plaintiff off his medication. (Uddin Decl. at ¶ 21-23).

69.     Dr. Uddin began the tapering because Plaintiff stated at that time that his pain had improved and because Dr. Baik's initial recommendation was only for one week of narcotics. (Uddin Decl. at ¶ 29).

ECF No. 33-2, pgs. 2-15.

Plaintiff has not filed an opposition or otherwise presented evidence in response to Defendant's motion for summary judgment.  As appropriate, the Court will consider Plaintiff's verified complaint as his declaration.[2]

### III. DISCUSSION

In the pending unopposed motion for summary judgment, Defendant argues that the undisputed facts show Defendant was not deliberately indifferent to Plaintiff's medical needs. See ECF No. 33.  For the reasons discussed below, the Court agrees that Defendant is entitled to judgment in his favor as a matter of law on Plaintiff's Eighth Amendment medical deliberate indifference claim.  Given the lack of any remaining federal claim, the Court will also recommend that the Court decline to exercise supplemental jurisdiction over any state law negligence claim suggested by Plaintiff's allegations. See 28 U.S.C. § 1367(c)(3) (permitting the District Court, in its discretion, to decline to exercise supplemental jurisdiction over state law claims in the absence of claims over which it has original jurisdiction).

/ / /

/ / /

---

[2]     The Court notes that Plaintiff references various exhibits in his complaint, but no exhibits are attached.

9

1   The treatment a prisoner receives in prison and the conditions under which the

2   prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

3   and unusual punishment.   See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

4   511 U.S. 825, 832 (1994).  The Eighth Amendment ". . .embodies broad and idealistic concepts of

5   dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

6   (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

7   Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

8   "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

9   801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

10  two requirements are met: (1) objectively, the official's act or omission must be so serious such

11  that it results in the denial of the minimal civilized measure of life's necessities; and (2)

12  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

13  inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

14  official must have a "sufficiently culpable mind."  See id.

15  Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

16  injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105;

17  see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health

18  needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by

19  Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

20  treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

21  wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled

22  on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

23  also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

24  are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

25  whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

26  condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122,

27  1131-32 (9th Cir. 2000) (en banc).

28  / / /

1      The requirement of deliberate indifference is less stringent in medical needs cases

2  than in other Eighth Amendment contexts because the responsibility to provide inmates with

3  medical care does not generally conflict with competing penological concerns.  See McGuckin,

4  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

5  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

6  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

7  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).

8      Defendant argues:

9          Plaintiff attributes two acts to Dr. Uddin, that he claims constitute
   deliberate indifference to his medical needs: (1) the refusal to send him out
10  to follow up with an eye specialist after he was released from UCD, and
   (2) "cutting Plaintiff's pain medication off and on which caused Plaintiff
11  to suffer." (Compl. at ¶ 17.) Plaintiff can adduce no evidence that Dr.
   Uddin did either.

12      ECF No. 33, pg. 13.

13

14  More specifically, Defendant contends: (1) Defendant was not responsible for any delay in

15  Plaintiff seeing an eye specialist; (2) Plaintiff and the inmate who attacked him are responsible for

16  the loss of vision in Plaintiff's left eye; and (3) Plaintiff has no evidence that Defendant cut off

17  his pain medication.  See id. at 14-17.

18      **A.**    **Delay in Seeing an Eye Specialist**

19      Delay in providing medical treatment, or interference with medical treatment, may

20  constitute deliberate indifference.  See Lopez, 203 F.3d at 1131.  Where delay is alleged,

21  however, the prisoner must also demonstrate that the delay led to further injury.  See McGuckin,

22  974 F.2d at 1060.  In this case, the Court agrees with Defendant that, in essence, there was no

23  delay because Plaintiff was able to promptly see an eye.  Moreover, to the extent there was a

24  delay attributable to Defendant, Plaintiff cannot show that the loss of his eyesight was caused by

25  that delay.  To the contrary, the loss of sight in Plaintiff's left eye was caused by either Plaintiff's

26  refusal to accept further medical treatment or the attack on Plaintiff by another inmate while

27  Plaintiff's eye was still healing.

28  / / /

1     The undisputed facts show that Defendant did not refuse to send Plaintiff for follow-

2  up with an eye specialist, as recommended.  As an initial matter, the Court observes that Plaintiff's

3  complaint is ambiguous as to exactly which follow-up medical appointment Defendant allegedly

4  failed to schedule.  Plaintiff clarified this ambiguity at his deposition.  Specifically, at his

5  deposition, Plaintiff testified that naming Dr. Tesluk in Paragraph 30 of the complaint was a

6  mistake and that the allegation should read "[Defendant Uddin] failed to follow the instructions

7  and recommendations submitted by Dr. Annie Baik…"  See Pl's Depo. at pp. 113:23-114:9.

8  Given this testimony, and evidence indicating that Dr. Baik was a treating specialist at UC Davis

9  Medical Center, the Court will focus on whether there is evidence that Defendant failed to send

10  Plaintiff for follow-up appointments consistent with recommendations from any eye doctor at UC

11  Davis Medical Center.

12     Leading up to Plaintiff's treatment at UC Davis Medical Center, Plaintiff

13  underwent a cataract procedure on his left eye at the Modesto Eye Surgery facility August 4,

14  2020.  See Feinberg Decl. at ¶ 17; Uddin Decl. at ¶ 13.  Dr. Tesluk, who performed the surgery,

15  recommended that Plaintiff be seen for a follow-up appointment in three to seven days. See

16  Feinberg Decl. at ¶ 17.  Plaintiff was seen by Dr. Tesluk two days after the cataract procedure –

17  on August 6, 2020. See Feinberg Decl. at ¶ 19; Uddin Decl. at ¶ 14.  Three days later – on August

18  9, 2020 – Plaintiff was attacked by his cellmate who struck Plaintiff in his left eye with a fist or

19  blunt object.  See Pl's Depo. at p. 62:20-25; 66:3-11; Feinberg Decl. at ¶ 21.  Plaintiff was

20  immediately taken to the emergency department at UC Davis Medical Center.  See Feinberg

21  Decl. at ¶ 21.

22     The undisputed evidence reflects that Plaintiff was seen by doctors at UC Davis

23  Medical Center on the following occasions:

24     August 9, 2020     Plaintiff was seen at UC Davis Medical Center

25     emergency department following attack by cellmate. Emergency surgery on the damaged left eye was

26     performed.  See Feinberg Decl. at ¶ 22. Uddin Decl. at ¶ 16).

27  / / /

28  / / /

12

| | | |
|---|---|---|
| 1 | August 21, 2020 | Plaintiff was seen at UC Davis Medical Center for a follow-up appointment following the emergency surgery on August 9, 2020. A laser iridotomy was unsuccessfully performed. See Feinberg Decl. at ¶ 27; Uddin Decl. at ¶¶ 19, 21. |
| 2 | | |
| 3 | | |
| 4 | August 26, 2020 | Plaintiff was seen at UC Davis Medical Center for a follow-up after the unsuccessful procedure on August 21, 2020. At the time, elevated intraocular pressure was noted. Plaintiff was returned to prison without any discharge instructions or doctor's notes. Defendant obtained discharge instructions on September 9, 2020, which reflected that the treating physician at UC Davis Medical Center – Dr. Baik – recommended that Plaintiff be seen for a follow-up appointment in "2-3 weeks." See Feinberg Decl. at ¶ 28 and 29, Uddin Decl. at ¶¶ 21, 25, and 26. |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |

Upon receipt of Dr. Baik's recommendations, Defendant ordered that Plaintiff be urgently seen for follow-up care, and Plaintiff was seen by Dr. Tesluk on September 17, 2020. See Feinberg Decl. at ¶ 30. Dr. Tesluk noted that Plaintiff had lost all sight in the left eye and that the focus should be on palliative care instead of restoration of vision. See Feinberg Decl. at ¶ 30, Uddin Decl. at ¶ 28.

The undisputed evidence in this case reveals that there were no delays in scheduling follow-up care. Plaintiff was transported to UC Davis Medical Center for emergency surgery immediately following the attack on August 9, 2020. After emergency surgery was performed on August 9, 2020, Plaintiff was again seen at UC Davis Medical Center for a follow-up appointment on August 21, 2020. There is no evidence of delay – let alone delay caused by Defendant – between the August 9, 2020, emergency surgery and the August 21, 2020, follow-up appointment. Plaintiff was seen again at UC Davis Medical Center for a follow-up on August 26, 2020. Again, there is no evidence that there was any delay attributable to the conduct of Defendant Uddin.

Plaintiff returned from the August 26, 2020, follow-up appointment without any discharge instructions, which Defendant did not obtain until September 9, 2020. As to the period between August 26, 2020, and September 9, 2020, the undisputed evidence reflects that Defendant Uddin and, on his direction, members of the doctor's staff, made every effort to obtain the notes and instructions from the August 26, 2020, visit at UC Davis Medical Center. When

13

1  those instructions were finally received by Defendant Uddin on September 9, 2020, he noticed

2  Dr. Baik's recommendation for a follow-up in "2-3 weeks," and ordered an urgent follow-up

3  appointment for Plaintiff, which occurred on September 17, 2020.  Thus, the evidence establishes

4  that Defendant Uddin did not delay the follow-up ordered by Dr. Baik.  In fact, as per Dr. Baik's

5  instructions, Plaintiff was seen within approximately three weeks of the August 26, 2020, visit at

6  UC Davis Medical Center.

7          Even if there was undue delay attributable to Defendant Uddin, Plaintiff still

8  cannot prevail because the undisputed evidence shows that Plaintiff did not suffer further injury

9  as a result of delay.  Following Plaintiff's cataract surgery, Plaintiff was attacked by his cellmate

10  and struck in his left eye, which was still healing from surgery.  This resulted in same-day

11  emergency surgery, an unsuccessful laser procedure a few days later, and eventually loss of

12  vision in Plaintiff's left eye.  It was the cellmate attack – not any conduct attributable to

13  Defendant Uddin – which resulted in the loss of Plaintiff's vision.  Additionally, the evidence

14  reflects that, as of August 6, 2020, Plaintiff refused all further medical intervention regarding his

15  left eye.  Thus, to the extent further medical procedures could have resulted in a restoration of

16  Plaintiff's vision, it was Plaintiff's refusal to accept such intervention following the attack that

17  caused Plaintiff's vision loss, not any conduct attributable to Defendant Uddin.

18          The Court finds that Defendant has met his initial burden on summary judgment of

19  demonstrating the non-existence of a genuine dispute as to essential elements of Plaintiff's Eighth

20  Amendment Claim.  Plaintiff has not opposed Defendant's motion or otherwise presented

21  evidence to suggest a genuine dispute of fact.  The Court will, therefore, recommend summary

22  judgment in Defendant's favor as to Plaintiff's claim based on delay.

23      **B.    <u>Plaintiff's Medication</u>**

24          A difference of opinion between the prisoner and medical providers concerning the

25  appropriate course of treatment does not generally give rise to an Eighth Amendment claim.  <u>See</u>

26  <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996).  However, a claim involving alternate

27  courses of treatment may succeed where the plaintiff shows: (1) the chosen course of treatment

28  was medically unacceptable under the circumstances; and (2) the alternative treatment was

14

1   chosen in conscious disregard of an excessive risk to the prisoner's health.  See Toguchi v.

2   Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).

3          Here, the undisputed evidence shows that, when Plaintiff was discharged from UC

4   Davis Medical Center on August 26, 2020, Plaintiff was given a one-week prescription for Norco

5   (Tylenol plus hydrocodone).  See Feinberg Decl. at ¶ 28. Uddin Decl. at ¶¶ 21, 29.  As with all

6   inmates prescribed nonformulary medication, and because Norco is not available at the prison,

7   Defendant Uddin changed Plaintiff's prescription to Tylenol with codeine (Tylenol 3).  See

8   Feinberg Decl. at ¶ 28. Uddin Decl. at ¶ 21.  By September 23, 2020, Defendant Uddin began

9   tapering Plaintiff off pain medication because Dr. Baik had only ordered medication for one week

10  and because Plaintiff stated that his pain symptoms had improved following the emergency

11  surgery.  See Uddin Decl. at ¶¶ 21-23, 29

12         The Court finds that the evidence in this case shows that Defendant Uddin changed

13  Plaintiff's pain medication to Tylenol 3 and eventually tapered pain medication altogether based

14  on sound medical judgment, specifically Dr. Baik's recommendation for one-week only of

15  medication as well as Plaintiff's reports of improved pain symptoms by September 23, 2020.

16  Plaintiff has presented no evidence to indicate that Defendant Uddin's decision was medically

17  unacceptable or that it was made in conscious disregard of an excessive risk to Plaintiff's health

18  or to cause Plaintiff's unnecessary pain.  The Court, therefore, finds that summary judgment in

19  Defendant's favor is also appropriate as to Plaintiff's claim relating to medication.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that Defendant's unopposed motion for summary judgment, ECF No. 33, be GRANTED and that the Court decline to exercise supplemental jurisdiction over any state law claims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the Court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  <u>See</u> <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 24, 2025

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE